GOODMAN and others, Trustees, Respondents, vs. BROWN LAND & LUMBER COMPANY, Appellant, and BELOW, Respondent.

*February 13—May 6, 1924.*

*Sales: Contract to manufacture and deliver lumber: Ambiguities: Prior correspondence between parties: Instalment deliveries: Default of buyer in payment of prior instalment: Measure of damages on breach by seller: Evidence: Sufficiency.*

1. Written correspondence between two contracting parties prior to the execution of the contract was admissible to explain ambiguities in the contract itself and to put the court in the same position as the parties in determining its meaning. p. 579.

2. A contract between defendant and one B. for the sale of lumber to be manufactured being susceptible of the construction given it by the trial court as to the time and manner of piling the lumber and the method of delivery, it is *held* that the evidence clearly sustains a finding of fact that the defendant did not proceed to perform the contract in accordance with its meaning. p. 581.

3. The seller being itself in default in performing its contract with the buyer, it is *held* that it could not, under the circumstances, insist upon payment by the buyer of his notes given in payment for the lumber already received.   p. 581.
4. The measure of damages upon breach of the contract by the seller is the difference between the market price at the time specified for delivery and the contract price.   p. 582.
5. It was the duty of the court to reconcile the complex and confusing testimony on the question of damages for breach of the contract to ship the lumber, so far as possible, and his conclusions will not be disturbed on a respondent's application for a review of the damages pursuant to sec. 3049*a*, Stats., unless they appear to be opposed to the great weight or clear preponderance of the evidence.   p. 583.

APPEAL from a judgment of the circuit court for Oneida county: A. H. REID, Circuit Judge.   *Affirmed.*

This is an appeal from a judgment in favor of the plaintiffs for $30,462.14.

This is an action by plaintiffs for damages for breach of two contracts on the purchase of lumber by *H. F. Below* from the defendant.   Plaintiffs are trustees of the assets of said *Below,* with power to sue on such contracts.   The contracts are known as No. 9116, dated January 9, 1920, and No. 9121, dated January 12, 1920.   Two actions were begun in the circuit court, one on each separate contract, which actions were consolidated on the trial.

The essential parts of contract 9116 read as follows:

". . . First party agrees to sell to second party, and second party agrees to purchase from first party f. o. b. cars Saxon, Wisconsin, rate, 500,000 feet half each birch and maple 4/4 and thicker No. 3 common and better, logs to be cut 4/4 and thicker in percentages of thickness usual to first party's sawing.   Prices are as follows, per M. ft.: Rough, . . .

"First party agrees to put said lumber in pile at mill between February 1, 1920, and July 1, 1920, to load said lumber on cars prior to six months from pile date.

"Second party agrees to make an advance payment when this contract is signed of five (5) per cent. of the contract price in cash, subject to 2 % discount, or in the form of second party's six months' note without interest, not sub-

ject to 2 % discount, and to make a further advance payment of eighty per cent. of the contract price of said lumber (less freight), each fifteen days as lumber goes into pile, on estimates furnished by first party, said payments to be either in cash, subject to 2 % discount, or in second party's four months' note or notes without interest, not subject to 2 % discount, balance of contract price to be paid as lumber is shipped. Second party agrees to pay notes immediately prior to shipment if lumber is ordered shipped out faster than notes mature.

"Second party further agrees to order lumber shipped out within four months of piling date and to fully pay for all unshipped lumber (not ordered shipped out) six months from piling date. Lumber is to be graded at shipping point according to National Hardwood Lumber Association rules of inspection, each party to pay one half of the cost of inspection if lumber is graded by a National Hardwood Lumber Association inspector."

The essential parts in controversy of "Memorandum of contract" 9121 are as follows:

". . . First party agrees to sell to second party, and second party agrees to purchase from first party f. o. b. cars Saxon, Wisconsin, rate.

"One million feet 4/4 and thicker, number two common and better, rough, logs to be full woods-run, no veneer taken out, stock to be full product of the log number two common and better and logs to be cut 4/4 and thicker in percentages of thickness usual to first party's sawing. . . .

"First party agrees to put said lumber in pile at mill during the 1920 sawing season prior to July 1st, and to load said lumber on cars prior to six months from piling date.

"Second party agrees to make an advance payment when this contract is signed of five (5) per cent. of the contract price in cash, subject to 2 % discount, or in the form of second party's six months' note without interest, not subject to 2 % discount, and to make a further advance payment of eighty per cent. of the contract price of said lumber (less freight), each fifteen days as lumber goes into pile, on estimates furnished by first party, said payments to be either in cash, subject to 2 % discount, or in second party's four

months' note or notes without interest, not subject to 2 % discount, balance of contract price to be paid as lumber is shipped. Second party agrees to pay notes immediately prior to shipment if lumber is ordered shipped out faster than notes mature.

"Second party further agrees to order lumber shipped out within four months of piling date and to fully pay for all unshipped lumber (not ordered shipped out) six months from piling date. Lumber is to be graded at shipping point according to National Hardwood Lumber Association rules of inspection, each party to pay one half of the cost of inspection if lumber is graded by a National Hardwood Lumber Association inspector."

This memorandum was modified by letter of defendant to *Below* subsequently, to the effect that if the defendant was unable to get the stock all in pile by July 1, 1920, through causes beyond its control, *Below* would take whatever portion of the stock that was sawed between July 1st and September 30th, with the definite understanding that he would be protected against loss of any lumber that might be damaged on account of doze by reason of its being put in pile after July 1st.

The execution of contract 9121 was preceded by a telegram from defendant to plaintiff in which the defendant claims that it believes it could purchase one million fine quality birch logs, which would cut largely 5/4 and thicker, about twelve-log timber, and saying that it was willing to purchase these logs only if the plaintiff would take all number two common and better lumber developing at $5 per thousand more than prices named in contract mailed today (January 8, 1920, referring to contract 9116), and under exactly same terms and conditions. The telegram ends, "Other parties are after these logs and will get them unless we act tomorrow morning wire quick tonight if possible;" to which plaintiff replied under date of January 9th, "Will accept extra million birch same terms prices your wire of eighth." On January 12th the defendant wrote the

plaintiff inclosing a memorandum of contract in duplicate covering conditional offer of one million feet of birch, accepted by plaintiff. In this letter the defendant explains the term in the contract, "put said lumber in pile at mill during the 1920 sawing season prior to July 1st, if possible," and in a postscript adds, "Since dictating the above, we have gotten word that our deal for the 1,000,000 feet has gone through and, therefore, contract is definitely closed between us, subject to your statement being satisfactory to us."

Contract 9121 provided that defendant should put said lumber in pile at mill during the 1920 sawing season prior to July 1st, and to load said lumber on cars prior to six months from piling date. As originally drawn, this contract provided that the lumber should be put in pile prior to July 1st, "if possible," but the words "if possible" were stricken out by *Below* and the contract returned to the defendant with a letter notifying the defendant that "We have x'd out the two words 'if possible,' after July 1st, and your letter of the 16th with our signature will take care of that part of it."

*E. D. Minahan* of Rhinelander, for the appellant.

*Charles F. Smith, Jr.,* of Rhinelander and *H. R. Goldman* of Marinette, for the respondents.

The following opinion was filed March 11, 1924:

CROWNHART, J. The correspondence between the parties prior to the execution of contract 9121 was admitted in evidence by the court, over the objection of the defendant, to explain ambiguities in the contract. The plaintiffs contended on the trial that *Below* was to have the lumber from a definite lot of logs which would run twelve logs to the thousand and which were to be cut and put in pile at one place, and such correspondence was admitted to aid in the construction of the contract. The defendant takes exception to the admission of such evidence.

In *Excelsior W. Co. v. Messinger,* 116 Wis. 549 (93 N.
W. 459), at p. 553, this court said:

"While it is not permissible to offer extrinsic evidence of
the terms of the agreement,—of what one party or the other
promised,—to vary, defeat, or add any term in a written
contract, it is permissible, in case of ambiguity, to introduce
evidence to ascertain the subject matter with reference to
which parties proceeded to negotiate and contract, and their
situation and surrounding circumstances, so that the court
may stand in substantially the same light in reading the
words of the contract as did the parties when adopting those
words. . . . So far as such communications, verbal or
written, serve merely to establish the situation or surround-
ings, they differ not at all from other evidence of the same
facts. So far, however, as they relate to the terms of the
agreement between the parties, they cannot be received.
The writing must be taken as their final expression."

We deem the written correspondence between the parties
leading up to what was called by the defendant a "memoran-
dum of contract" was properly admitted to put the court in
the same position as the parties in determining the meaning
of the contract. As we construe the findings of the court,
he used such evidence for no other purpose. Defendant's
objection is not sustained by the authorities.

As we view this case there are no serious questions of law
involved. The main questions in dispute are questions of
fact. The defendant makes 126 assignments of error. Man-
ifestly, these assignments cannot be separately treated with-
out extending this opinion to an unreasonable length. The
case was carefully tried and a large volume of testimony was
introduced. The able trial court made extensive findings of
fact and conclusions of law, and the case was elucidated by a
very able opinion. Upon a careful review of the evidence
we come to the conclusion that the findings of fact of the
trial court are amply sustained by the evidence.

It seems plain from the contract itself that *Below* was to
have all the lumber of the grades specified produced from an

exceptionally fine quality of logs at one place or one mill, the lumber to be put in pile as fast as sawed and invoiced to *Below* every fifteen days. It was clearly contemplated by the contract that the sawing would commence early enough to have the lumber all in pile prior to July 1st, unless circumstances over which the defendant had no control should intervene. No such circumstances were established on the trial. *Below* was a dealer in lumber, and in the ordinary course of business, if the defendant had complied with its contract, he could have arranged sales of the lumber so produced from time to time as it was put in pile and invoiced. Under this contract the defendant did not produce any lumber or put any lumber in pile prior to July 1st, although persistently urged to do so by *Below*. On the contrary, the defendant, by evasive and misleading communications, misled *Below* as to the facts. No doubt the defendant, when it offered *Below* the million feet of lumber, and when *Below* accepted the same, thought it had the timber under contract with the Blackwell-Kaiser people. However, it failed to secure this lot of timber, and, instead of frankly disclosing the situation to *Below,* it sought to evade the real conditions of the contract and trust to luck to substitute other timber of inferior quality in lieu of the contract timber. This led to dissensions resulting finally in the breach of the contract on the part of the defendant and its cancellation.

It appears that the market was very strong for lumber of the quality called for in the contract during the period in which the lumber should have been produced, and the defendant seized upon the opportunity to sell lumber in the open market which it could have assigned to *Below* under the contract, in order to profit thereby. The result was that *Below* lost the profits which he could have reasonably made had the lumber been produced and delivered as the contract called for.

The court construed contract 9116 to require the defendant to fill it by manufacturing into lumber a sufficient quan-

tity of woods-run logs of each kind of timber to produce the quantity contracted to be sold, *Below* to have the full product of the log, and to put the same into pile as sawed, the piles to be segregated and allotted to *Below* and to be loaded out on his orders. The court further held that the contract did not require all the lumber to be put in pile at any one particular place, but did require that all lumber produced was to be delivered in carload lots. The court said that it was "entirely clear that it [the defendant] did not proceed to perform the contract in accordance with its meaning. It neither manufactured and put into pile separately the product of woods-run logs nor allotted any such product to the contract, nor did it memo. invoice any such product. The memo. invoicing was done of arbitrary quantities of different dimensions and grades selected merely on paper from the inventories of the mills, and never in any other way designated."

The contract is susceptible of the construction given to it by the court, and the finding of fact is clearly sustained by the evidence. The court further found that *Below* was misled by the memo, invoices and communications with reference to this lumber by the defendant, and was unable to secure shipping orders for his customers, and that he protested against the defendant's method of carrying out its contract, and also refused to make certain payments for the lumber which the defendant demanded under its contract. But the court further found that the defendant was so much in default in the performance of its contract that it had no right to take advantage of *Below's* default in payment of his notes. The final result of the dissensions and differences between *Below* and the defendant was that the defendant canceled contract 9116 at the same time that it canceled contract 9121, leaving a large portion of this contract unfulfilled.

The trial court was right in holding that the defendant, being itself in default, could not insist upon *Below* paying

his notes under the circumstances. *Greer v. Oelhafen,* 180 Wis. 131, 192 N. W. 467; *North Coast L. Co. v. Great Northern L. Co.* 144 Minn. 304, 175 N. W. 547; *Howard Co. v. Pasha,* 103 Neb. 296, 172 N. W. 55; *California S. & W. P. Agency v. Penoyar,* 167 Cal. 274, 139 Pac. 671; *Goodyear T. & R. Co. v. Vulcanized P. Co.* 228 N. Y. 118, 126 N. E. 710.

The breach of the contract on the part of the defendant resulted in damages to *Below,* but it became a very serious question to the court to determine the amount of such damages. Much evidence was introduced on this proposition. On the part of *Below* it was contended that had the lumber been produced and delivered as contemplated by the contract, he would have received profits on sales thereof ranging from $10 to $50 per thousand. Both parties prepared tabulations of prices under varying conditions, which were widely divergent as to the damages occasioned by the breach of the contracts. Under these circumstances the court was compelled to use his best judgment. He applied the correct rule of damages, that is, the difference between the market price and the contract price of the lumber. The difficulty arose largely out of the uncertainty of the evidence as to the time in which the lumber would have been available for sale by *Below* if it had been produced according to the contract.

The plaintiffs have filed an application for a review of the case on the subject of damages, as prescribed by sec. 3049a, Stats., and have asked to have the judgment very largely increased.

The court saw and heard the witnesses and was in position to determine the facts and draw his conclusions better than this court, and unless we find that his findings are against the clear preponderance of the evidence the findings must stand. *Hubbard v. Ferry,* 141 Wis. 17, 123 N. W. 142; *Carlson v. Dixon,* 155 Wis. 63, 143 N. W. 1064; *Evans v. Evans,* 173 Wis. 141, 179 N. W. 755; *Miley v. Heaney,* 168 Wis. 58, 169 N. W. 64; *Joseph F. Rothe F. Co. v. Harding,* 180 Wis. 14, 191 N. W. 551; *Hayton v. Appleton*

Lange Canning Co. v. Industrial Comm. 183 Wis. 583.

*M. Co.* 179 Wis. 597, 192 N. W. 168. There was a great mass of complex and confusing testimony. It was the duty of the court to reconcile this testimony, so far as possible, and his conclusions will not be disturbed unless they appear to be opposed to the great weight or clear preponderance of the evidence. *Hudson v. Trustees, etc.* 171 Wis. 238, 177 N. W. 14; *Racine W. Co. v. Racine,* 97 Wis. 93, 72 N. W. 350. On the whole, we are satisfied that the case was tried by the court with great ability, and that his judgment must stand. Certainly the evidence fully supports the amount of damages awarded to the plaintiffs.

*By the Court.*—The judgment of the circuit court is affirmed.

The appellant moved for a rehearing.

In support of the motion there was a brief by *E. D. Minahan* of Rhinelander.

In opposition thereto there was a brief by *Charles F. Smith, Jr.,* of Rhinelander and *Eastman & Goldman* of Marinette.

The motion was denied, with $25 costs, on May 6, 1924.